**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 23-cr-79 (RBW)** |
| | **:** | |
| **JONATHAN BROWN** | **:** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

On July 31, 2021, amid his participation in an extensive drug conspiracy, the Defendant ignited a gun battle that claimed the life of innocent bystander Kervin Sanches—an educator, a soon-to-be husband, and a father of four. For the reasons set forth below, and consistent with the parties' plea agreement, the Government respectfully requests that the Court accept the terms of the plea agreement as negotiated by the parties and sentence the Defendant to 180 months of incarceration, to run consecutive to the 51-month sentence he received in 22-cr-114 (TJK) and 48 months of Supervised Release. Should the Court do so, the Defendant will, together, be sentenced to more than 19 years of imprisonment.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### *The Drug Conspiracy*

In or around late 2021, members of the Metropolitan Police Department ("MPD"), in conjunction with the Federal Bureau of Investigation, began investigating violent crime and drug trafficking activities occurring in or around the corner of 7th Street and O Street in Northwest, Washington, DC.

Law enforcement quickly discovered that a specific group of individuals associated together in this area on a regular basis, including the Defendant and other defendants named in Case No. 22-CR-164 (RBW), with the shared purpose of selling controlled substances in the District of Columbia from on or about July 1, 2021, through at least May 25, 2022. Law

enforcement identified several stash houses that the group used for storing drugs close by and for processing and packaging drugs for resale. Law enforcement installed covert cameras in hallways to observe who was using these stash houses. Through hallway surveillance and physical surveillance capturing hand to hand drug sale transactions on the sidewalk, law enforcement identified targets for further investigation. Law enforcement conducted extensive physical surveillance of the members of the conspiracy selling controlled substances in the area of 7th Street and O Street, NW.

Law enforcement began executing controlled purchases of both crack cocaine and fentanyl from members of this drug trafficking group. These purchases were recorded and monitored.

The quantities of crack cocaine purchased by law enforcement ranged from one gram to over 28 grams at a time. The members of this group, in total, sold law enforcement approximately 158 grams of cocaine base. The quantities of fentanyl purchased by law enforcement from members of this drug trafficking group ranged from less than one gram up to 65 grams at a time. The charged members of this group, in total, sold law enforcement approximately 470 grams of fentanyl.

During the course of the conspiracy, Defendant Brown visited the 1221 M Street stash house on a regular basis and was present on a regular basis while the group was processing controlled substances. Defendant Brown also sold controlled substances with other members of the conspiracy on various occasions. Text messages recovered from Defendant Brown's phone demonstrate that he was selling fentanyl and cocaine base and using other members of the conspiracy to consummate transactions.

For example, on March 14, 2022, an unidentified individual ("UI") wrote to Defendant Brown "60 for down and I got 10 for up so 70 altogether," referring to fentanyl as down and crack cocaine as up. Defendant Brown responded, "ok got u." On March 15, 2022, Defendant Brown asked a separate UI, "Wat u need." The UI responded, "Can u look out with 10 down," referring to fentanyl. After discussing logistics, Defendant Brown responded "ok. Billy coming," referring to another co-conspirator, who was the leaseholder for the 1221 M Street stash house who often transported drugs from drug traffickers in his apartment, to drug users/ buyers on the street in front of his apartment building. Additional text messages were recovered from Defendant Brown's phone discussing similar transactions with narcotics customers.

Through this investigation, law enforcement determined that the group was working together to control the drug trafficking activity in their territory. The Defendant knowingly and intentionally agreed with the members of this conspiracy to participate in a conspiracy to distribute various narcotics-including cocaine base.

The Defendant's role in the conspiracy included the distribution and the possession with the intent to distribute cocaine base and the Defendant agreed as part of his plea that it was reasonably foreseeable to him that at least 16.8 grams but less than 22.4 grams of cocaine base would be distributed by members of the conspiracy, which is attributable to him as a member of the conspiracy.

### *July 31, 2021, Homicide*

On July 31, 2021, at approximately 11:20 p.m., Defendant Brown traveled to the area of 7th and O Streets, NW, with a loaded firearm. An unidentified male ("UM") in a grey Pontiac followed the Defendant to this location and parked nearby. The Defendant parked his automobile

on O Street, NW, exited his car, and walked across the street to greet other associates, some of whom were members of the drug trafficking conspiracy described above. As the Defendant approached the group on the corner of 7th and O, the UM approached the group from the other direction with a firearm in his hand. As the UM came closer to the group, the Defendant (shown in the below screenshots) pulled a firearm from his waistband and began shooting at the UM. The UM instantly began returning fire with a firearm that he brought to the scene.



The group standing on the corner scattered as the Defendant and the UM continued to shoot at each other while fleeing in opposite directions and taking cover behind trees and cars. As the shooting continued, the occupants of a white automobile parked near the Defendant's car, exited their automobile and also began shooting in the direction of the UM as the UM fled. In all, at least 25 shell casings were recovered from the area.

Kervin Sanches was part of the group standing on the corner of 7th and O Streets, NW, as the Defendant approached. Kervin fled in the opposite direction from Defendant Brown, closer

toward the flight path of the UM. Kervin was struck by a bullet while fleeing the scene. He died of the gunshot wound after being transported to the hospital.

The Defendant agreed as part of his plea that but for his actions of pulling a loaded firearm from his waistband and beginning to shoot at the UM that evening, the remainder of this urban gun battle would not have unfolded and Kervin's death would not have occurred. The Defendant further agreed that in doing so, he acted with a conscious disregard of an extreme risk of death or serious bodily injury to another person.

### *March 22, 2022, Arrest*

On the evening of Tuesday, March 22, 2022, MPD officers located a black Audi that matched the description of a vehicle used in a shooting earlier that day. The Audi was located in the parking lot of the Kennedy Rec Center. This rec center is located at the corner of 7th and O Streets, NW, near where the July 31, 2021, homicide occurred.

Officers waited for the automobile to begin moving again. An unmarked MPD vehicle attempted to stop the Audi in the area of the 600 block of P Street, NW. Upon activating their lights and sirens, the black Audi began to increase speed and disregard several traffic lights and stop signs. Eventually, the Audi failed to negotiate a turn properly, due to the high rate of speed, and crashed into a street sign and tree at the corner of Vermont Avenue and O Street, NW. The Defendant, the driver and sole occupant of the vehicle, immediately exited the car and began fleeing police on foot. MPD officers in turn chased the Defendant. Officers observed what they believed to be the Defendant with a firearm and repeatedly yelled for him to drop the firearm. The Defendant threw his cell phone and a firearm during this brief foot chase. Officers eventually detained the Defendant near the intersection of 13th and O Street, NW.

Officers located a loaded firearm approximately 20 feet from the Defendant. The firearm was a Tan Shadow Systems MR920 "Ghost Gun" (lacking serial number), loaded with 18 rounds of ammunition in a 30-round high-capacity magazine, with a laser sight attached to the muzzle. The Defendant—a felon—later acknowledged that he possessed this firearm during the attempted traffic stop and threw it during the brief foot chase.

On March 31, 2022, the Defendant was indicted in U.S. District Court, case 22-cr-114 (TJK) for Unlawful Possession of Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1), along with other firearm-related offenses, fleeing, and reckless driving. He pleaded guilty in that case to one count of § 922(g)(1), and was ultimately sentenced on March 26, 2024, to 51 months of imprisonment.

Separately, the Defendant was indicted in the instant case on March 14, 2023. The instant case was related to 22-cr-164 (RBW), the main drug conspiracy case charged in Count One of the instant Indictment. On June 17, 2024, he pleaded guilty to a two-count information charging Conspiracy to Distribute and Possess with Intent to Distribute a Controlled Substance, in violation of 18 U.S.C. §§ 841, 846, and Voluntary Manslaughter While Armed, in violation of D.C. Code §§ 2105, 4502.

## III.   OBJECTIONS TO THE PSR

The Government filed its objections to the PSR. With respect to paragraph 108 of the PSR, the Government is aware that the Defendant has or had a presence on Instagram.

## IV.   LEGAL STANDARD

Pursuant to 18 U.S.C. § 3553(a), the court shall impose a sentence that is sufficient, but not

6

greater than necessary, to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" and to "provide the defendant with needed educational or vocational training." 18 U.S.C. § 3553(a)(2). In addition, the Court must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant;" the types of sentences available; the Sentencing Guidelines; any pertinent policy statements; the need to avoid unwarranted sentence disparities; and the need to provide restitution to any victims. *Id.* § 3553(a). In determining the appropriate sentence, the Court should consider all of the applicable factors set forth in § 3553(a). *See United States v. Gall*, 552 U.S. 38, 48 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

1) The nature and circumstances of the offense and the history and characteristics of the defendant;

2) The need for the sentence imposed –
   a) To reflect the serious of the offense, to promote respect for the law, and to provide just punishment for the offense;
   b) To afford adequate deterrence to criminal conduct;
   c) To protect the public from further crimes of the defendant; and
   d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3) The kinds of sentences available;

4) The kinds of sentence and the sentencing range established for –

   a) The applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
      i) Issued by the Sentencing Commission . . . ; and
      ii) That . . . are in effect on the date the defendant is sentenced

5) Any pertinent policy statement –
   a) Issued by the Sentencing Commission . . . and
   b) That . . . is in effect on the date the defendant is sentenced

6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7) The need to provide restitution to any victims of the offense.

## IV.   ARGUMENT

The Government's requested sentence is appropriate. The Defendant—who, at the relatively young age of 31, has already earned enough Criminal History points to place him in the highest Criminal History Category contemplated by the U.S. Sentencing Guidelines—participated in an extensive drug conspiracy and triggered a shoot-out that left a member of our community dead. The Government's recommended sentence reflects the seriousness of that offense and provides just punishment for it. The recommended sentence is also designed to deter the Defendant and others from engaging in other criminal conduct, protect the public from the Defendant, provide correctional treatment, and promote respect for the law.

### 1.   The Nature, Circumstances, and Seriousness of the Offense

The conduct in which the Defendant engaged is reprehensible. Our community has faced staggering consequences from gun violence. D.C. saw over 200 homicides in each of 2021 and 2022, and then 274 in 2023. *See* MPD, *District Crime Data at a Glance*.[1] Guns play a central role in this violence: about 82 percent of the 226 homicides in 2021 involved the use of a firearm. *See* MPD, *Annual Report 2021*, 27.[2] The Defendant himself contributed to these statistics.

---

[1] https://mpdc.dc.gov/page/district-crime-data-glance
[2] https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/AR_2021_FINAL_ lowres.pdf

But the death that the Defendant caused was not a mere statistic, and the life of Kervin Sanches is measured by far more than just a number. He died roughly two months before he was to get married after proposing to his finance at the housewarming party celebrating the purchase of their new home.




He and his fiancée are the proud parents of two sets of twin boys together, who are now aged three and half and eleven.

 

As shown in Government Exhibits 1 and 2, victim impact statements from two of Kervin's older children, his death devastated his family. Kervin was also a Dean of Students at a local charter school. He is now dead because of the Defendant, who neither thought nor cared about the lives he risked when he started a gunfight on a busy city street and trapped people in the crossfire.

After realizing the pain and destruction that he caused, the Defendant could have chosen to take his life in a different direction. Instead, over the next nearly 8 months that the Defendant remained free, he continued to wreak havoc. He participated in a drug conspiracy. Drug trafficking ravages communities. Not only can these and other drugs cause severe harm to individual users and their loved ones, but drug trafficking can bring violence and disruption to communities, making it harder for people to live their lives. The nature and circumstances of this offense demand a lengthy period of incarceration.

**2.      The Defendant's History and Characteristics**

The Defendant, who is now 31 years old, already has six prior adult convictions. These convictions demonstrate that his criminal behavior escalated in seriousness. His first two convictions were in 2011 for Contempt, after he was found to have violated an order requiring him to stay away from the area of the 1300 block of 7th St., NW (i.e., 7th Street between N and O

Streets). *See* PSR, ¶¶ 78-79. The next year, he was convicted for Carrying a Pistol Without a License after he again violated the stay away order and was found with a gun. *See id.*, ¶ 80. After that, he was convicted yet again of possessing a gun. *See id.*, ¶ 81. Then, in 2016, he was convicted of robbery after he and two other people—one of whom had a firearm—robbed two individuals of wallets, keys, and a phone. *See id.*, ¶ 82. One of the victims was hit in the back and went to the hospital. *Id.* A subsequent search of the Defendant's residence yielded, among other things, a firearm. And, as previously mentioned, his sixth conviction came recently in 22-cr-114 (TJK), after he was arrested with a gun on March 22, 2023. *See id.*, ¶ 83.

After each of his earlier five convictions, the Defendant was placed on probation or Supervised Release. Despite having the opportunity to better himself while under supervision, the Defendant chose to commit ever more serious crimes. His worsening criminal history merits the Government's requested sentence.

### 3.     The Need to Promote Respect for the Law and Deterrence

Given the catastrophic impact that the Defendant has had on our community, the parties' agreed sentence is warranted. Too many people do not understand or fear the consequences to themselves or their community that flow from drug trafficking, gun possession, and even shooting, and they must understand that their conduct is unacceptable. The parties' agreed sentence is designed to signal that if people make choices like the Defendant, they risk spending a significant portion of their lives in prison.

### 4.     Other factors

The Government's recommended sentence is also justified to protect the public from the Defendant, who keeps offending and whose criminal conduct is getting only more serious. It would

also give the Defendant ample time to pursue further educational and vocational training and participate in other programs that will hopefully give him the ability to change his life should he finally choose to do so.

## V.   CONCLUSION

For the foregoing reasons, the Government recommends that the Court sentence the Defendant to 180 months of incarceration, to run consecutive to the 51 months he received in 22-cr-114 (TJK), to be followed by 48 months of Supervised Release.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
DC Bar No. 481052

By:     */s/ Solomon S. Eppel*
Solomon S. Eppel (D.C. Bar No. 1046323)
Erin DeRiso (Virginia Bar No. 89114)
Kevin Rosenberg (Ohio Bar No. 0081448)
Assistant United States Attorneys
601 D Street, NW
Washington, DC 20530
(202) 252-6661 (Eppel)
(202) 252-7699 (DeRiso)
(202) 252-7833 (Rosenberg)
solomon.eppel@usdoj.gov
kevin.rosenberg@usdoj.gov
erin.deriso@usdoj.gov